**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

**JOHN and KAREN WALDROP, as parents
and legal guardians of B.W., et al.,**

    **Plaintiffs,**

**vs.**              **Civ. No.  14-047 JH/KBM**

**NEW MEXICO HUMAN SERVICES
DEPARTMENT, et al.,**

    **Defendants.**

<u>**MEMORANDUM OPINION AND ORDER**</u>

This matter is before the Court on several motions filed in conjunction with the Plaintiffs' motion for preliminary injunction addressing the constitutional rights of New Mexicans who are enrolled in New Mexico's home and community-based Medicaid waiver program for people with developmental disabilities, also known as the DD Waiver. Defendants New Mexico Human Services Department and New Mexico Department of Health have recently overhauled the DD Waiver program, which now includes the use of a benefits-calculation formula known as the Supports Intensity Scale, or "SIS." Implementation of the SIS has resulted in a reduction in the level of benefits to some DD Waiver recipients.  In this lawsuit, Plaintiffs challenge the Defendants' use and application of the SIS in a manner which they contend violates several federal statutes as well as Plaintiffs' rights under the Constitution of the United States.

On March 27, 2014, Plaintiffs filed their motion for preliminary injunction in which they asked the Court to order Defendants to return the DD Waiver program to the status quo that existed prior to implementation of the SIS, including an order prohibiting Defendants from terminating or reducing any DD Waiver services until Defendants provide the recipients with

notice and a fair hearing. On August 18-20, 2014, the Court held an evidentiary hearing on the Plaintiffs' motion for preliminary injunction, at which counsel for both sides were present and at which the Court considered the evidence offered by both Plaintiffs and Defendants. In connection with the motion for preliminary injunction, the Defendants have made three motions, now fully briefed, which include a motion in limine, a motion to dismiss for lack of standing, and a motion to strike certain witnesses offered by Plaintiffs on grounds that Plaintiffs violated discovery rules.

## DISCUSSION

I.   **Defendants' Motion in Limine [Doc. 59] and Defendants' Motion for Partial Dismissal of Plaintiffs' Claims Due to Lack of Standing [Doc. 58][1]**

Two motions filed by the Defendants in advance of the preliminary injunction hearing are closely related and therefore should be discussed together.

In their motion in limine [Doc. 59], Defendants ask the Court not to consider any testimony or evidence regarding any DD Waiver applicant other than the named individual Plaintiffs in this case. They argue that Plaintiffs' First Amended Complaint [Doc. 6] identifies eight individuals "for whom relief is sought in this action," and thus testimony and evidence relating to other individuals is irrelevant and its consideration would result in unfair prejudice to Defendants.

The motion in limine is closely related to Defendants' motion for partial dismissal of Plaintiffs' claims due to lack of standing [Doc. 58], in which Defendants contend that organizational Plaintiff Disability Rights New Mexico ("DRNM") lacks standing to assert claims on behalf of itself or any individuals other than the individual named plaintiffs (though they

---

[1] Neither motion was fully briefed until after the conclusion of the three day preliminary injunction hearing. Accordingly, at the hearing the Court took both motions under advisement.

appear to concede that DRNM has standing to sue on behalf of the individual named plaintiffs). Defendants argue that the amended complaint does not allege injury to DRNM itself, and that DRNM cannot show that it has standing to assert claims relating to any individuals other than the eight individual named plaintiffs. They point out that DRNM cannot show that any individuals other than the named plaintiffs have exhausted their administrative remedies under the current state regulations implementing the revised DD Waiver in New Mexico. With regard to Plaintiff The Arc of New Mexico ("The Arc"), Defendants acknowledge that it has standing to sue on behalf of two individual named plaintiffs, S.K. and L.D., because The Arc is their legal guardian. However, Defendants argue that The Arc lacks standing to sue on behalf of anyone else because the complaint does not allege any injury to The Arc itself or any injury to any individuals other than the named individual plaintiffs. Further, Defendants point out that unlike DRNM, The Arc is not the officially-designated protection and advocacy system for New Mexico, but rather a community-based organization of and for people with developmental disabilities. Finally, Defendants argue that no named individual plaintiff has standing to bring claims on behalf of any individual other than a named individual plaintiff. This last point does not appear to be in dispute.

The Court will address the question of standing first, followed by the issues raised in the motion in limine.

###### A.  Law Regarding Standing

The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (citing *Allen v. Wright*, 468 U.S. 737, 751 (1984)). Absent a plaintiff with constitutional standing,

federal courts lack jurisdiction. *Summers v. Earth Island Inst*., 555 U.S. 488, 492-93 (2009). To satisfy Article III's standing requirements, a plaintiff must allege:

> (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Environmental Servs*., 528 U.S. at 180-81 (citing *Defenders of Wildlife*, 504 U.S. at 560-61).

An organization may attempt to assert standing on its own behalf.  *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n. 19 (1982). When asserting standing on its own behalf, an organization must be able to demonstrate some injury to the association itself that meets the constitutional standing requirements as well as the prudential limitations on standing, unless Congress evinced a clear intent to eliminate those prudential limitations under the statute in question.  *See id*. at 378-79, 102 S.Ct. 1114.  As the *Havens* Court stated, courts conduct the same inquiry with respect to an organizational plaintiff as with an individual plaintiff: has it "alleged such a personal stake in the outcome of the controversy as to warrant [ ] invocation of federal court jurisdiction."  *Id*. (internal quotation marks and citations omitted).

However, even in the absence of injury to itself, an association may have standing solely as the representative of its members. *Warth v. Seldin*, 422 U.S. at 511. In order to demonstrate "associational" standing, the association

> must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit. . . . So long as this can be established, and so long as the nature of the claim and of the relief sought does not make the individual participation of each injured party indispensable to proper resolution of the cause, the association may be an appropriate representative of its members, entitled to invoke the court's jurisdiction.

*Id.* The Supreme Court has crystalized the concept of associational standing to three elements, finding that an association has standing when: (1) its members would otherwise have standing to sue in their own right; (2) the interests it seeks to protect are germane to the organization's purpose; and (3) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit. *Hunt v. Washington State Apple Advertising Commission*, 432 U.S. 333, 343 (1977); *Friends of the Earth*, 528 U.S. at 181.

Subsequently, in *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544 (1996), the Supreme Court explained that the Article III limitations on standing required the satisfaction of only the first two prongs of the *Hunt* test. *Id*. at 554-555. "[O]nce an association has satisfied *Hunt*'s first and second prongs assuring adversarial vigor in pursuing a claim for which members Article III standing exists, it is difficult to see a constitutional necessity for anything more." *Id*. at 556. Thus, an association may have standing to sue on behalf of its members as long as the members would have standing to sue in their own behalf and the litigation is germane to the group's purpose. *Id*.

**B.     Legal Standard**

When evaluating a plaintiff's standing at the stage of a motion to dismiss on the pleadings, "both the trial and reviewing courts must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Warth v. Seldin*, 422 U.S. 490, 501 (1975). "We also must construe the statements made in the affidavits in the light most favorable to the petitioner." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1089 (10th Cir. 2006) (en banc) (internal quotation marks omitted). "At the pleading stage, 'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are

necessary to support the claim.' " *Southern Utah Wilderness Alliance v. Palma* 707 F.3d 1143, 1152 (10th Cir. 2013) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561(1992)). It is permissible for the Court to allow a plaintiff to submit affidavits in support of standing. *See Palma*, 707 F.3d at 1152 and n.8.

C.      **Allegations Regarding Standing of DRNM and The Arc**

Paragraph 36 of the First Amended Complaint [Doc. 6] states as follows:

> Disability Rights New Mexico ("DRNM") is a private, non-profit organization whose mission is to protect, promote and expand the rights of persons with disabilities. DRNM is the designated Protection and Advocacy System for New Mexico, and has authority under federal law to pursue legal, administrative and other remedies on behalf of persons with disabilities. Additionally, Congress has specifically given DRNM both the responsibility and the authorization to initiate legal action designed to protect the rights of persons with developmental disabilities as the designated Protection and Advocacy System for the state of New Mexico. 42 U.S.C. §§ 15001. The ARC of New Mexico is a community based organization of and for people with intellectual and developmental disabilities. The mission of the ARC is to improve the quality of life for persons with developmental disabilities through advocacy on their behalf. In addition, the ARC provides corporate guardianship services for individuals throughout the state of New Mexico. Many of these individuals are participants in the DD Waiver program.

It is undisputed that DRNM is the official protection and advocacy system for persons with developmental disabilities in New Mexico under the Developmental Disabilities Assistance and Bill of Rights Act ("the DD Act"). *See* 42 U.S.C. §§ 15001 et seq. Plaintiffs further allege that DRNM and The Arc represent and/or advocate for persons receiving DD Waiver services, and that "due to the manner in which the Defendants use the SIS tool, some individual Plaintiffs, and many DD Waiver recipients represented by the organizational Plaintiffs, have already lost some medically necessary services and therapies." Doc. 6 at 76, 78. Since implementation of the SIS, DRM has received hundreds of calls from DD Waiver recipients with questions, concerns, and complaints about the SIS and its implementation. Curtiss Aff., Doc. 40-1 at ¶ 3-14, 20. The Arc

has fielded many similar calls and has participated in nearly 180 SIS assessments since 2011. Faubion Aff., Doc. 60 at ¶ 3-4.

The briefs contain other statements—essentially assertions of counsel—that are unsupported by allegations in the amended complaint or by affidavits. *See, e.g.*, Doc. 64 at 4 ("members directly or indirectly control the activities and actions of The Arc's board of directors"). The Court will not consider these unsupported assertions in analyzing the issue of standing.

### D.     Plaintiffs' Claims and Requested Relief

As further explained below, the nature of Plaintiffs' claims and the relief they seek are relevant to whether DRNM and The Arc have associational standing.

Plaintiffs allege that each individual Plaintiff named in the Amended Complaint [Doc. 6] is receiving services through the New Mexico DD Waiver. Plaintiffs also allege that the organizational Plaintiffs represent and/or advocate for persons receiving those DD Waiver services. Plaintiffs' amended complaint is directed toward the manner in which the Defendants have implemented the new assessment tool known as the SIS. Each SIS group has limitations concerning the amount of ancillary therapies (including speech and language, physical, and occupational therapies) available for each individual recipient. According to the Plaintiffs, due to the manner in which the Defendants use the SIS tool, some individual Plaintiffs, and many DD Waiver recipients represented by the organizational Plaintiffs, have already lost some medically necessary services and therapies. Plaintiffs allege that others will lose therapies and residential placements previously available to them under the former assessment system. Plaintiffs allege that DD Waiver recipients did not receive proper notice that their Medicaid services could be or had been reduced. According to Plaintiffs,

> In all known cases where a notice was received, the notice provided did not contain the legal or factual bases for the reduction, an explanation of how the SIS system operates, or a proper explanation of the recipients' appeal rights as required by federal law. Without that information, Plaintiffs and DD Waiver participants are unable to meaningfully contest reductions in their services.

Doc. 6 at ¶ 88.

Plaintiffs' causes of action include violation of the Medicaid Act's fair hearing requirements (Count 1), violation of the right to due process under the Fourteenth Amendment (Count 2), violation of the Medicaid Act and due process (Count 3), violation of the New Mexico Administrative Procedures Act (Count 4), violation of the freedom of choice provisions of the Medicaid Act (Count 5), violation of the Americans With Disabilities Act and of Section 504 of the Rehabilitation Act based on lack of available integrated setting (Count 6), violation of the Americans With Disabilities Act and of Section 504 of the Rehabilitation Act based on discrimination against DD Waiver recipients (Count 7), and violation of the Medicaid Act by HSD on the basis of its delegation of authority and discretion to DOH (Count 8).

Plaintiffs have requested relief in the form of declaratory judgment, injunction, reinstatement of certain services, attorney's fees, and costs.  The amended complaint contains no request for damages.

## E.    Analysis

While claiming that they have both organizational and associational standing, Plaintiffs DRNM and The Arc have "reserved" their argument that they have organizational standing based on direct injuries to their respective organizations. *See* Doc. 64 at 3. *Warth v. Seldin*, 422 U.S. 490, 511 (1975) ("There is no question that an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy", but "[e]ven in the absence of injury to itself, an association

may have standing solely as the representative of its members."). Thus, the Court focuses only on the Plaintiffs' claim to associational standing.

       1.    <u>DRNM</u>

As stated above, Defendants admit that DRNM, as a recognized protection and advocacy system for the developmentally disabled under federal law, has associational standing to represent the named individual plaintiffs, but they contest its standing to represent other unnamed developmentally disabled persons.

As the designated protection and advocacy system for the developmentally disabled citizens of New Mexico, DRM possesses the authority to "pursue legal, administrative, and other appropriate remedies or approaches to ensure the protection of, and advocacy for, the rights of such [developmentally disabled] individuals within the State who are or who may be eligible for treatment, services, or habilitation . . ." 42 U.S.C. § 15043(a)(2)(i). Further, Section 15044(b)(1) provides that "[n]othing in this title shall preclude a system from bringing a suit on behalf of individuals with developmental disabilities against a State, or an agency or instrumentality of a State." Finally, federal law governing protection and advocacy systems such as DRNM requires that its government board be composed of a majority of members who are individuals with disabilities, or the parents, family members, guardians, advocates, or authorized representatives of such individuals with disabilities. 42 U.S.C. § 15044(a)(1). There is nothing in the record to suggest that DRNM and its governing board are not in compliance with the statute.

On the record before the Court, it appears that DRMN meets both prerequisites for associational standing to sue on behalf of unnamed plaintiffs. First, because DRNM is the official protection and advocacy system for the developmentally disabled in New Mexico, DRNM's disabled members would otherwise have standing to sue in their own right for

violations of their statutory and constitutional rights as set forth in the first amended complaint. Second, it is undisputed and clear that the interests that DRNM seeks to protect in this lawsuit are germane to the organization's purpose. Third, the DD Act expressly grants DRNM authority to pursue legal remedies on behalf of developmentally disabled New Mexicans.

At least one prior decision from the District of New Mexico reached the same conclusion. In a case similar to this one, the State of New Mexico argued that DRNM lacked standing to sue on behalf of unspecified developmentally disabled individuals. Another District Judge of this Court found DRNM (then known as "New Mexico Protection and Advocacy System") to have associational standing to sue on behalf of unnamed developmentally disabled individuals. *See Lewis v. New Mexico Dept. of Health*, No. CIV 99-021 MV/JHG, slip op., Doc. No. 175 at 13 (D.N.M. Nov. 5, 2002). After careful consideration, the *Lewis* court agreed with the reasoning of the Eleventh Circuit in *Doe v. Stincer*, 175 F.3d 879, 885 (11th Cir. 1999), concluding that the Protection and Advocacy for Mentally Ill Individuals Act ("the PAMII Act"), 42 U.S.C. §§ 10801 et seq. (1997)—which for relevant purposes is very similar to the DD Act—did not require the organizational plaintiff to name the specific individuals on whose behalf it was suing. The Eleventh Circuit stated:

> Nothing in the PAMII can reasonably be read to require the Advocacy Center to name a specific individual in bringing suit to redress violations of the rights of individuals with mental illness. The text of PAMII grants standing to protection and advocacy systems to pursue legal remedies to 'ensure protection of individuals with mental illness.' Considering the statute as a whole, we cannot read this language to require a protection and advocacy system to name a specific individual in order to have standing to sue. The very purpose of PAMII was to confer standing on protection and advocacy systems, such as the Advocacy Center, as representative bodies charged with the authority to protect and litigate the rights of individuals with mental illness.
>
> * * * * * *
>
> Moreover, under Article III's established doctrines of representational standing, we have never held that a party suing as a representative must specifically name

the individual on whose behalf the suit is brought and we decline to create such a requirement in PAMII.

175 F.3d at 884 (internal citations omitted).

The *Lewis* court agreed with the Eleventh Circuit's conclusion, as does the Court now. With regard to the breadth of authority given to the protection and advocacy systems described and the purposes of the two statutes, there is no reason to read the DD Act more narrowly that the PAMII Act. In both instances, "[i]t is enough for the representative entity to allege that one of its members or constituents has suffered an injury that would allow it to bring suit in its own right." *Id*. at 885.

Defendants' efforts to distinguish *Lewis* are unpersuasive. They argue that *Lewis* was different because plaintiffs in this case are easy to identify, whereas in *Lewis*, the court observed that "it may be impractical to identify an individual plaintiff–precisely because of the potential violations to legal rights that must be addressed." *Lewis*, Doc. 175 at 13. Defendants ignore the next two sentences of the *Lewis* opinion, which explain that the populations served by the DD Act and the PAMII Act are often unable to recognize violations of their own rights due to their mental and physical limitations. The same is true of the developmentally disabled persons served by DRNM. Finally, the Court declines Defendants' invitation, *see* Doc. 80 at 7, to rely on two opinions from other federal district courts finding that protection and advocacy systems like DRNM have a more limited right to sue on behalf of their constituents; both cases are older than the Eleventh Circuit's decision in *Stincer* and therefore lacked the benefit of its reasoning. *See Tennessee Protection & Advocacy, Inc. v. Bd. of Educ. of Putnam Cnty., Tenn*., 24 F. Supp. 2d 808, 814 (M.D. Tenn. 1998) and *Protection & Advocacy, Inc. v. Murphy*, No. 90 C 569, 1992 WL 59100, at *12 (N.D. Ill. Mar. 16, 1992).

The Court concludes that DRNM has standing to sue for unnamed plaintiffs.

2.    The Arc

Defendants argue that The Arc lacks associational standing to sue on behalf of any unnamed plaintiffs, though they do not dispute The Arc's standing to represent S.K. and L.D. They contend that The Arc cannot establish that any other individual has standing to sue in his or her own right, and that unlike DRNM it is not an officially designated protection and advocacy system. Doc. 58 at 7. Defendants contend that because it is not an official protection and advocacy system, The Arc must satisfy the third prong from *Hunt* and show that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. *See* Doc. 80 at 5.

According to the first amended complaint, The ARC is a community based organization of and for people with intellectual and developmental disabilities, and its mission is to improve the quality of life for persons with developmental disabilities through advocacy on their behalf. In addition, The ARC provides corporate guardianship services for individuals throughout New Mexico, many of whom are participants in the DD Waiver program.

With regard to the first *Hunt* factor—that at least one of The Arc's members would otherwise have standing to sue in his or her own right—the Supreme Court has stated that the test satisfies the constitutional requirements of standing by requiring "an organization suing as representative to include at least one member with standing to present, in his or her own right, the claim (or the type of claim) pleaded by the association." *United Food and Commercial Workers Union Local 751 v. Brown Group, Inc*., 517 U.S. 544, 555 (1996). The Arc has done that here by presenting the claims of two members whom it represents, S.K. and L.D. The Arc need not identify still more individual members with claims against Defendants in order to satisfy *Hunt* and *Brown Group*. Therefore, the first prong of the *Hunt* test is satisfied. Next, The

Arc must show that the interests it seeks to protect in this lawsuit are germane to its purpose. The Arc has alleged in the first amended complaint that "[t]he mission of the ARC is to improve the quality of life for persons with developmental disabilities through advocacy on their behalf." Although this allegation is thin, it is enough. This is a motion to dismiss, and therefore The Arc need not come forward with evidence outside the complaint to support this allegation.[2] Defendants do not contend that The Arc's interests in this lawsuit are not germane to its organizational purpose. Accordingly, the second prong of the Hunt test for associational standing is satisfied as well.

Next, Defendants argue that The Arc must satisfy the third prong of the *Hunt* test by showing that "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Defendants contend that courts have waived this requirement only for recognized protection and advocacy systems such as DRNM, which Plaintiffs dispute. The Court need not reach this question, however, because the requirement is satisfied. First, it is well established that this third prong is a prudential limitation, not a constitutional one. *United Food & Commercial Workers Union Local 751 v. Brown Grp.*, 517 U.S. 544, 557 (1996). The third prong focuses on "matters of administrative convenience and efficiency." *Id.* Courts assess this prong by examining both the relief requested and the claims asserted. *Cornerstone Christian Schs. v. Univ. Interscholastic League*, 563 F.3d 127, 134 n. 5 (5th Cir. 2009). Relying on *Warth v. Seldin*, 422 U.S. 490 (1975), *Hunt* held that "individual participation" is not normally necessary when an association seeks prospective or injunctive relief for its members, but indicated that such participation would be required in an action for

---

[2] However, the Court does note that at the August 18, 2014 hearing, Sally Faubion, Director of Guardianship of The Arc, testified that "The Arc is an agency that advocates for persons with developmental disabilities and their families," and that it serves as court-appointed guardian for approximately 190 such persons. Transcript of Preliminary Injunction Hearing, Doc. 77 at 19.

damages to an association's members, thus suggesting that an association's action for damages running solely to its members would be barred for want of the association's standing to sue. *See Hunt, supra*, at 343, 97 S.Ct. at 2441. Thus, Courts of Appeals have not required an association to satisfy this third prong when seeking only injunctive or declaratory relief on behalf of its members, and they allow standing if an association plaintiff can prove its case with a sampling of evidence from its members. *Ass'n of Am. Physicians and Surgeons, Inc. v. Texas Medical Board*, 627 F.3d 547, 552-53 (5th Cir. 2010); *Bano v. Union Carbide Corp.*, 361 F.3d 696, 714 (2d Cir. 2004); *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278 (3d Cir. 2002); *Hosp. Council of W. Pa. v. City of Pittsburgh*, 949 F.2d 83 (3d Cir. 1991); *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 601-02, 608 (7th Cir. 1993). A review of the amended complaint reveals that Plaintiffs are seeking injunctive and declaratory relief, but not damages. Furthermore, Plaintiffs may establish due process and statutory violations through a sampling of the types of notice and fair hearing provided by Defendants to various members of DRNM and The Arc. Thus, the participation of individual plaintiffs is not necessary here, and the third *Hunt* requirement is satisfied.

Finally, Defendants argue that The Arc lacks standing to sue because of the possibility that some unnamed individual plaintiffs may not have exhausted their administrative remedies. The Defendants' arguments might be meritorious if Plaintiffs were seeking damages or specific levels of benefits under the DD Waiver. While the statutory and constitutional challenges raised here may affect the outcome of individual entitlement determinations if Plaintiffs are successful on the merits of claims, Plaintiffs in this action do not directly seek DD Waiver benefits or damages. Rather, decisions as to the proper level of benefits for individual recipients will remain the province of state authorities. The question is thus not whether there are any individual

members of DRNM and The Arc who might have circumvented state administrative and judicial processes in order to bring the claims that the organizations now seek to litigate. Rather, it is whether there are members of DRNM and The Arc who did not receive proper notice and opportunity to be heard when the Defendants were determining the level of DD Waiver benefits. Such individuals would have the live interest in challenging the Defendant's practices that would support standing in this case. And there is no question here that such persons are among DRNM and The Arc's members. Thus, this case is like *International Union, United Automobile, Aerospace And Agricultural Implement Workers Of America v. Brock*, 477 U.S. 274, 284 (1986), in which the Supreme Court found associational standing under similar circumstances.

Based on the foregoing, the court concludes that The Arc has associational standing to sue on behalf of unnamed plaintiffs who are members of that organization. Accordingly, the Defendants' motion will be denied.

### F.   Defendants' Motion in Limine [Doc. 59]

In their Motion in Limine, Defendants argue that the Court should not consider any evidence offered by the Plaintiffs at the hearing on the Plaintiffs' motion for preliminary injunction "regarding any DD Waiver applicants, individually or collectively, other than the named individual Plaintiffs in this matter." Doc. 59 at 1. Defendants reason that because neither DRNM nor The Arc has standing to bring claims on behalf of anyone other than the named individual plaintiffs, evidence regarding such persons is irrelevant. Further, Defendants argue that even if it is relevant, the evidence should be excluded under Rule 403 of the Federal Rules of Evidence.

As discussed above, the Court has concluded that DRNM and The Arc do have associational standing to represent individuals not named as plaintiffs in this case. Thus, the

evidence is not irrelevant, at least not on the grounds advanced by Defendants. As Plaintiffs point out, they have alleged that the policies, practices, and procedures Defendants have used to implement the new DD Waiver violate the due process and Medicaid Act rights of all DD Waiver recipients. Plaintiffs are alleging that Defendants have deprived all DD Waiver recipients of timely and adequate notice, as well as an opportunity to present their own witnesses and to confront the witnesses and evidence against them. *See* Doc. 11 at 26. As alleged by the Plaintiffs, these claims apply to many or even most recipients in the DD Waiver program, not merely the named Plaintiffs. The evidence is relevant under Rule 401.

In addition, Defendants contend that the probative value of the evidence is outweighed by unfair prejudice to the Defendants. Defendants argue that a determination of whether to issue a preliminary injunction requires a "highly individualized and particularized inquiry," which is incompatible with the claims of "amorphous individuals or groups of individuals." Doc. 59 at 5. Defendants also claim that evidence regarding unnamed plaintiffs is improper because Plaintiffs have not asserted a class action. According to Defendants, in the absence of a Rule 23 class action, Plaintiffs should be limited to presenting evidence pertaining to named individual plaintiffs. Doc. 59 at 7, Doc. 83 at 3.

These arguments were raised and rejected in *International Union, United Auto., Aerospace And Agricultural Implement Workers Of Am. v. Brock*, 477 U.S. 274, 287-88 (1986), in which the defendant argued that "at least absent a showing of particularized need," members of an association who wish to litigate common questions of law or fact against the same defendant should be required to proceed under Rule 23, rather than representation of individual members through the vehicle of associational standing.  In declining to repudiate the doctrine of associational standing, the Supreme Court pointed out that such a repudiation would fail to

recognize the special features distinguishing suits by associations on behalf of their members from class actions. While a class action creates an ad hoc union of injured plaintiffs who may be linked only by their common claims, an association suing to vindicate its members' interests can draw upon a pre-existing reservoir of expertise and capital that can assist both courts and plaintiffs. *Id*. at 289. In addition, the doctrine of associational standing recognizes that the primary reason people join an organization is often to create an effective vehicle for vindicating interests that they share with others. *Id*. at 289-90.

Accordingly, Defendants' motion in limine will be denied in its entirety.

## III.    Defendants' Expedited Motion to Strike Plaintiffs' Witnesses [Doc. 68]

Defendants move the Court to bar testimony from Plaintiffs' witnesses Sally Faubion, Katherine Wray, and Peter Cubra.[3] Sally Faubion is an employee of and the representative for organizational Plaintiff The Arc. Katherine Wray and Peter Cubra are both attorneys who have represented developmentally disabled individuals who have participated in the DD Waiver during the transition to the SIS assessment process, though neither represents the Plaintiffs in this case. Wray represented Plaintiff L.D. in her fair hearing following L.D.'s assignment to Group C and in her appeal of the administrative decision to state district court. Plaintiffs identified all three as fact witnesses who may offer opinions in the course of their testimony. However, at the preliminary injunction hearing itself, Plaintiffs offered only Cubra as an expert witness. As grounds for their motion to strike, Defendants contend that Plaintiffs improperly invoked the

---

[3] Defendants filed this motion in advance of the preliminary injunction hearing, though Plaintiffs did not file their response until after the hearing. In light of the very short time between the time of filing and the hearing itself, the Court took the motion under advisement and heard testimony from the witnesses at issue. As a result, the question now before the Court is whether or not to consider their testimony in ruling on the preliminary injunction.

principles of work product immunity and attorney-client privilege to withhold documents pertinent to the witnesses' testimony in this case. As an alternative form of relief, Defendants ask the Court to compel each witness to attend a second deposition to answer questions regarding their conversations with Plaintiffs' counsel and to produce additional documents.

A key fact which Defendants omit from their motion is that the discovery that took place prior to the preliminary injunction hearing was very limited in nature; it was not a full discovery period, which ordinarily would provide adequate time for preparing privilege logs and for filing motions to compel or motions for protective order. Rather, it was a truncated discovery limited to obtaining sufficient information to prepare for the preliminary injunction hearing. This truncated discovery took place during over a few weeks leading up to the preliminary injunction hearing.

### A.      Faubion

According to Defendants' motion, Plaintiffs identified Faubion as both a fact and expert witness. Five days before Faubion's deposition, Defendants served Plaintiffs with a notice of deposition duces tecum requesting that Faubion bring to the deposition certain documents relating to her communications with Plaintiffs' counsel, among other things. Plaintiffs did not file an objection to the notice of deposition, but did inform Defendants' counsel that Faubion would not provide certain documents on the grounds of attorney-client privilege. Given the large number of documents and short period of time between the notice and the deposition, Plaintiffs did not provide a privilege log for these documents to Defendants. Similarly, Plaintiffs refused to produce certain documents in response to a request for production relating to communications between Faubion and Plaintiffs' counsel. According to Defendants, "[i]t is improper for Plaintiffs to present Ms. Faubion as a source of any 'expert opinion' in this matter when Plaintiffs have failed to produce the requested documents or a privilege log . . ." For the foregoing reasons, the

Court will deny the motion. First, at the preliminary injunction hearing Plaintiffs did not offer Faubion as an expert, and the Court has not given her testimony the weight of expert testimony. Rather, she testified only as a fact witness. Second, it seems unlikely that Defendants can defeat Plaintiffs' claim to attorney-client privilege with respect to communications between Faubion and Plaintiffs' counsel. It is clear to the Court that Faubion has served as the main client representative of The Arc. Faubion testified on behalf of The Arc at the preliminary injunction hearing and sat at counsel table as its representative. As such, it the attorney-client privilege protects all of Faubion's communications with Plaintiffs' counsel about this case. The Court finds no fault with Plaintiffs for failing to prepare a privilege log for all the requested documents and other communications between Plaintiffs' counsel and Faubion given the very short time period allotted for limited discovery prior to the preliminary injunction hearing. Thus, the Court will not strike Faubion's testimony.

     **B.**    **Wray**

According to Defendants, Ms. Wray testified that she had participated in a "litigation strategy discussion" with Plaintiffs' counsel, as well as another meeting with Plaintiffs' counsel, Cubra, and other attorneys who represent developmentally disabled clients. Defendants take issue with Wray's refusal to disclose the substance of discussions at these meetings, the content of her conversations and emails with Plaintiffs' counsel, and the content of her conversations with Faubion. Defendants contend that Plaintiffs were obligated to provide a privilege log for the materials that were not produced.  Thus, they argue that "[i]t is improper for Plaintiffs to present Ms. Wray as a source of any 'expert opinion' in this matter when Plaintiffs have failed to produce the requested documents or a privilege log regarding documents withheld," Doc. 68 at 9, because Defendants have not been able to discover the basis for her opinions. The Court

concludes that it need not reach the merits of Defendants' arguments as to Ms. Wray; the motion is moot because she was not offered and did not testify as an expert witness at the preliminary injunction hearing. Rather, she testified as a fact witness about what occurred during her representation of L.D. To the Court's knowledge, she offered no expert opinions, and if she did, the Court has not considered them here. Thus, the motion will be denied as to Wray.

**C.      Cubra**

Similarly, with regard to Cubra, Defendants complain that Plaintiffs failed to produce subpoenaed documents and other documents in response to a request for production pertaining to expert witnesses. Again, Plaintiffs objected on the basis of attorney-client privilege and work product doctrine but filed no motion for protective order, nor did they provide a privilege log. And again, Defendants reiterated their expectation that Cubra bring the documents to his deposition and answer questions about his communications with Plaintiffs' counsel regarding this case. At the preliminary injunction hearing, the Plaintiffs did offer Cubra as an expert witness in the case. Ultimately, however, the Court has not considered or relied upon Cubra's opinions in any way in reaching a decision on the motion for preliminary injunction. However, the Court has considered Cubra's testimony as a fact witness regarding certain events in which he participated as counsel for developmentally disabled individuals. Thus, because Defendants' motion appears to be based on an objection to Cubra's testimony as an expert, it will be denied as moot.

**D.      Conclusion**

For the foregoing reasons, the Court will deny the motion in its entirety at this time as they related to the testimony considered for the motion for preliminary injunction. However, the

motion is denied *without prejudice* to Defendants' right to raise these issues again at a later time, after the parties have an opportunity to engage in full and complete discovery.

**IV.     Plaintiffs' Motion for Preliminary Injunction [Doc. 11]**

    **A.     Background**

In their motion for preliminary injunction, Plaintiffs ask the Court to enjoin Defendants from reducing or terminating the services and supports of any DD Waiver recipient unless and until the Defendants first afford those recipients constitutional procedural due process as well as comply with the Medicaid Act, 42 U.S.C. § 1936(a), and the regulations promulgated thereunder. They do not challenge the propriety of the use of the SIS assessment tool as a way to determine the proper level of benefits afforded to DD Waiver recipients.

The Court disagrees with Defendants' position that Plaintiffs, in fact, are seeking an order compelling the State of New Mexico to ignore the current CMS-approved State Medicaid Plan and to administer the DD Waiver program as though the former waiver (in force prior to July 2011) were still in effect. *See* Doc. 20 at 5-6. That is not the case. Rather, Plaintiffs are merely asking Defendants to comply with the terms of the current CMS-approved plan by implementing its components, including the SIS assessment process, with the proper procedural protections. Doing so will not place the State in the position of choosing either to violate the Medicaid Act or this Court's preliminary injunction order because the order will not require the State to do anything not authorized by CMS. Indeed, as further explained below, by complying with the preliminary injunction, the State will be in harmony with both constitutional law and the Medicaid Act. That compliance, in turn, will bring no conflict with the State's obligations to CMS, as CMS cannot and would not compel the State to act in a manner contrary to federal law.

### B.      Standard for Preliminary Injunction

"As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." *SCFC ILC, Inc. v. Visa USA, Inc*., 936 F.2d 1096, 1098 (10th Cir. 1991) (citation omitted); *United States ex rel. Citizen Band Potawatomi Indian Tribe of Okla. v. Enter. Mgmt. Consultants, Inc*., 883 F.2d 886, 888-89 (10th Cir. 1989) ("Because it constitutes drastic relief to be provided with caution, a preliminary injunction should be granted only in cases where the necessity for it is clearly established.").

To obtain a preliminary injunction the moving party must demonstrate four elements: (1) a likelihood that the moving party will suffer irreparable harm if the injunction is not granted; (2) the balance of equities is in the moving party's favor; (3) the preliminary injunction is in the public interest; and (4) a likelihood of success on the merits. *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009). If a movant can show the first three requirements "tip strongly in his favor, the test is modified." *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002). In such situations, the moving party "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Id*. (quotation omitted).

On the other hand, this modified test does not apply if the requested preliminary injunction is one of three disfavored types. *O Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975-76 (10th Cir. 2004) (en banc). These disfavored injunctions include: (1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits. *SCFC ILC, Inc. v. Visa USA, Inc*., 936 F.2d 1096, 1098-

99 (10th Cir. 1991). Such disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro*, 389 F.3d at 975.

In order to ascertain to the correct standard to apply to the request for preliminary injunction in this case, it is necessary to first determine if it is one of the disfavored types. Defendants argue that Plaintiffs' requested preliminary injunction is disfavored for two reasons: it alters the status quo, and it is mandatory. The Court addresses each in turn.

### 1.     Alteration of the Status Quo

The Tenth Circuit has "explained that the status quo is 'the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing.'" *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1155 (10th Cir. 2001) (quoting *SCFC ILC, Inc*. v. Vis USA, Inc., 936 F.2d 1096, 1100 n.8 (10th Cir. 1991)). "In determining the status quo for preliminary injunctions, this court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." *Id.*

In this case, the "last peaceable uncontested status existing between the parties before the dispute developed," 11A Charles Alan Wright et al., Federal Practice and Procedure § 2948, at 136 (2d ed.1995), was the level of benefits afforded to each individual plaintiff in their individual service plans before those benefits were reduced pursuant to the implementation of the SIS assessment method. Plaintiffs' motion for preliminary injunction requests restoration of the "DD Waiver services terminated or reduced as a result of the November 1, 2012 New Mexico regulations" [Doc. 11 at 33]—in other words, a return to the status quo.

### 2.     Mandatory Relief

An injunction may prohibit certain behavior (prohibitory), or it may require certain behavior (mandatory). Injunctions are not necessarily prohibitory merely because they preserve the status quo. *Schrier v. University of Colo.*, 427 F.3d 1253, 1260 (10th Cir. 2005); *O Centro*, 389 F.3d at 979. "Although mandatory injunctions also generally alter the status quo, that is not always the case. It is not at all difficult to envision situations where a mandatory injunction would preserve the status quo and a prohibitory injunction would alter the status quo." *O Centro*, 389 F.3d at 979. As the Court explained in *Schrier*, the Tenth Circuit "characterize[s] an injunction as mandatory if the requested relief affirmatively require[s] the nonmovant to act in a particular way, and as a result place[s] the issuing court in a position where it may have to provide ongoing supervision to assure the nonmovant is abiding by the injunction." 427 F.3d at 1261 (internal citation and quotation omitted).

The Court agrees with Defendants that the injunction that Plaintiffs seek is mandatory, in that it requires the Defendants to restore certain benefits to the movants and to maintain those benefits until it provides DD Waiver recipients with both notice and a fair hearing in accordance with the requirements of due process and federal statutes. Such an injunction requires action by the Defendants, and would require the Court to supervise the Defendants to ensure their compliance. Thus, it is mandatory in nature. As a result, the modified test does not apply here, and Plaintiffs must meet all four elements for a preliminary injunction.

### 3.     **Burden of Proof**

Defendants argue that Plaintiffs must show that all four of the elements for a disfavored preliminary injunction weigh "heavily and compellingly" in their favor. That is not the law in the Tenth Circuit. In *SCFC ILC, Inc*., a three-judge panel of the Tenth Circuit concluded that a movant seeking a disfavored injunction must "satisfy an even heavier burden of showing that the

four [preliminary injunction] factors . . . weigh heavily and compellingly in movant's favor before such an injunction may be issued." 936 F.2d at 1098-99. Subsequently, however, a majority of the court sitting *en banc* voted to affirm the core holding of *SCFC ILC, Inc*., but with one significant alteration. The Tenth Circuit "jettison[ed] that part of *SCFC ILC* which describes the showing the movant must make [when the movant requests a disfavored injunction] as 'heavily and compellingly.' " *O Centro*, 389 F.3d at 975. Instead, the *en banc* court held that

> courts in this Circuit must recognize that any preliminary injunction fitting within one of the disfavored categories must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course. Furthermore, because a historically disfavored preliminary injunction operates outside of the normal parameters for interim relief, movants seeking such an injunction are not entitled to rely on this Circuit's modified-likelihood-of-success-on-the-merits standard. Instead, a party seeking such an injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms, and may not rely on our modified likelihood-of-success-on-the-merits standard.

*Id*. at 975-96 (emphasis added).

Simply stated, the requirement that a movant requesting a disfavored injunction must make a showing that the traditional four factors weigh heavily and compellingly in his favor is no longer the law of the circuit. However, the Court will closely scrutinize each of the four applicable factors to ensure that Plaintiffs have made the requisite strong showing on likelihood of success on the merits and balance of harms.

### C.        Law Regarding Due Process

The Due Process Clause applies when government action deprives a person of liberty or property. *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005); U.S. Const. amend. XIV, § 1. It is well-established that a possessory interest in property invokes procedural due process protection, which requires adequate notice and a meaningful hearing prior to any attempt to deprive the interest holder of his or her property rights. *Mathews v. Eldridge*, 424 U.S. 319 (1976) (holding

that a claim of entitlement to social security benefits triggers due process protection). In *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 571 (1972), the Supreme Court noted that "property" is a "broad and majestic term." The Court "made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money," *id*. at 571-72, and "may take many forms," *id*. at 576. A property interest is created when a person has secured an interest in a specific benefit to which the individual has "a legitimate claim of entitlement," *id*., which the Supreme Court has found to include welfare benefits similar to those at issue in this case. *Goldberg v. Kelly*, 397 U.S. 254, 262 (1970).

It follows from the foregoing that DD Waiver recipients are entitled to meaningful notice of and participation in a hearing prior to any termination or reduction  in the benefits they are receiving under the Waiver. Under 42 C.F.R. § 431.205, the State must operate a fair hearing system that provides for a hearing before the State's Medicaid agency or an evidentiary hearing at the local level, with a right of appeal to a State agency hearing. The State may not reduce or terminate Medicaid benefits without providing a pre-deprivation hearing that "meet[s] the due process standards set forth in *Goldberg v. Kelly*, 397 U.S. 254 (1970)." *Id*. at § 431.205(d).

"The fundamental requisite of due process of law is the opportunity to be heard. The hearing must be at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (internal citations and quotations omitted). This means that a recipient must "have timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting his own arguments and evidence orally." *Id*. at 267-68.

Similarly, the federal regulations implementing the Medicaid Act mandate that a Medicaid recipient be given the opportunity to utilize the fair hearing process as a means to

challenge decisions made by the State. According to the regulations, that right is extremely broad and the State must provide the recipient with a fair hearing when a service has been denied or delayed, or when "he or she believes the agency has taken an action erroneously." 42 C.F.R. § 431.220(a)(1) and (2).

### D.    Findings of Fact

**<u>Background</u>**

The State of New Mexico has a Developmental Disabilities Waiver Program ("DD Waiver"), Defendants' Exhibit A, which is a Medicaid home and community-based services waiver program authorized by § 1915(C) of the Social Security Act. Transcript of Preliminary Injunction Hearing (hereafter, "TR") at 580 (Medrano); Defendants' Exhibit A at RRFP 12-000006 to RRFP 12-0000007. The DD Waiver provides supports to developmentally disabled adults living in communities throughout New Mexico, who otherwise would be entitled to placement in an intermediate care facility ("ICFMR"). TR at 224, 357 (Stevenson).

To be eligible for the DD Waiver, an individual first must be eligible for general Medicaid services and meet the eligibility criteria for an ICFMR. TR at 357 (Stevenson). A DD Waiver recipient may choose between the community-based DD Waiver services and the institutional-level care provided by an ICFMR. TR at page 224 (Stevenson). However, as a practical matter these types of institutions are generally no longer available in New Mexico. TR at 74 (Faubion), 265 (Stevenson); 406-07 (Kivitz).

The DD Waiver permits a state to furnish an array of home and community-based services that assist Medicaid beneficiaries to live in the community and avoid institutionalization. Defendants' Exhibit A at RRFP 12-000006. New Mexico's DD Waiver program serves individuals with mental retardation or specific related conditions and

developmental disabilities that occur before the age of twenty-two. *Id*. at RRFP 12-000009. The New Mexico Department of Health ("DOH") is responsible for the day to-day operations of the DD Waiver. *Id*.  The New Mexico Department of Human Services ("HSD") oversees DOH's operation of the waiver. *Id*.

In March of 2006, HSD's Medicaid Assistance Division requested a renewal of the DD Waiver. Defendants' Exhibit A RRFP 12-000005, et seq. On September 27, 2006, the Centers for Medicare & Medicaid Services ("CMS") approved the renewal request for a five-year period effective July 1, 2006. Defendants' Exhibit B.

In 2010, the Legislative Finance Committee of the New Mexico Legislature ("the LFC") conducted an audit of New Mexico's DD Waiver program. Defendants' Exhibit D; TR at 310 (Stevenson). In this audit, the LFC concluded that spending levels for New Mexico's existing DD Waiver Program were becoming unsustainable. Defendants' Exhibit D. The LFC also found that the DD Waiver Program lacked a needs-based assessment tool and utilization review process to ensure that DD Waiver recipients received the appropriate level of service. *Id*. Finally, the LFC determined that the number of individuals on the waiting list for the DD Waiver considerably outpaced allocations to the DD Waiver causing individuals with unknown needs to wait seven to eight years for waiver services. *Id*.

Before 2011, developmentally disabled individuals who entered the DD Waiver Program were subject to an assessment tool called the Adaptive Behavior Scale ("ABS"). TR at 311 (Stevenson). The ABS was not a standardized tool. TR at 311-12. Rather, the ABS's purpose was to provide a deficit-based look at an individual's functional ability. TR at 312. At that time, approximately 3,800 developmentally disabled individuals were served by the DD Waiver Program, and there were approximately 5,500 to 6,000 individuals on the DD Waiver waitlist.

TR at 311 (Stevenson). There was wide variance in needs (in terms of services provided and budgets) among people assigned to the same level of care. TR at 312.

Efforts to redesign the New Mexico DD Waiver program commenced in 2009. TR at 316-17 (Stevenson). The Developmental Disabilities Support Division ("DDSD") of DOH decided to initiate a pilot program to try a new assessment tool known as the SIS, in consultation with the State of New Mexico's contractors, the American Association on Intellectual and Developmental Disabilities ("AAIDD") and the Human Services Research Institute ("HSRI"). TR at 323-24 (Stevenson). The Supports Intensity Scale, or "SIS," is a standardized assessment tool that is used to assess the intensity and pattern of support needs that individuals with intellectual and developmental disabilities need to be successful in their communities. Deposition Testimony of Dr. Ravita Maharaj ("Maharaj Depo.") at 10.[4] The State of New Mexico implemented its SIS pilot program in the late winter and early spring of 2011. TR at 324 (Stevenson). As the pilot program was ongoing, the State of New Mexico submitted its application for the DD Waiver renewal informing CMS of "major changes" to its waiver program, including the use of the SIS and the plan to use a resource allocation prototype using data from the SIS. TR at 324 (Stevenson); Defendants' Exhibit J at RRFP 3-000001 to RRFP 3-000002. CMS approved the State of New Mexico's application for the DD Waiver on June 29, 2011, effective July 1, 2011. TR at 326 (Stevenson); Defendants' Exhibit K.

As stated above, the SIS is a standardized, normed, and validated assessment tool to determine the support needs that a developmentally disabled adult requires in order to live in the community. TR at 20 (Faubian); Maharaj Depo. at 10-11. The SIS assessment is a standardized

---

[4] Dr. Maharaj did not testify in person at the August 18-20, 2014 preliminary injunction hearing. Rather, by stipulation of the parties, her testimony was introduced through the transcript of her deposition.

questionnaire with about 89 items to measure an individual's need for support in various areas of the individual's life, using a rating scale. Maharaj Depo. at 11-12. The DD Waiver recipient and at least two others who know the recipient well (known as respondents) must attend the assessment. Maharaj Depo. at 13-14. However, medical providers are not consulted as part of the SIS assessment. TR at 55 (Faubion). Based on the respondents' answers to each question, the SIS assessor assigns each a raw score. *See* Maharaj Depo. at 14. Once the SIS assessment is completed, the raw scores are tabulated and translated into a standardized numerical score. Maharaj Depo. at 14-15. This score dictates the DD Waiver recipient's assignment to a particular group (as further described, *infra*), which in turn determines the recipient's budget and individual service packages, including the types and amounts of therapies. TR at 401-02 (Kivitz); TR at 46 (Faubion); TR at 592-93 (Medrano).

During approximately twenty years prior to the implementation of the SIS, people learned as part of the DD Waiver planning process to think and talk about individuals with disabilities with an eye towards their strengths and their talents. TR at 37 (Faubion). In contrast, as part of the State's overhaul of the DD Waiver program, the implementation of the SIS has required families and providers to talk in deficit-based terms. TR at 37-38 (Faubion). There was no training of DD Waiver recipients or their guardians, families, and service providers to account for this paradigm shift. TR at 38-39 (Faubion).

**The Process for DD Waiver Recipients Generally**

The process of implementing the SIS and notifying DD Waiver recipients of their rights generally is as follows.

First, the State of New Mexico sends the DD Waiver recipient's case manager a notice of SIS assessment. A case manager is a contractor compensated by the State. TR at 25-26

(Faubion); 624 (Rodriguez). The person being assessed, as well as at least two respondents, must attend the SIS assessment. Maharaj Depo. at 13-14; TR at 462-63 (Hill). The Notice of SIS Assessment states that a mandatory SIS assessment will take place and provides information concerning the coordination of a SIS interview. *See, e.g.*, Plaintiffs' Exhibit 61. The Notice also includes the Department of Health "fact sheet" on the SIS assessment. *See id*. at P100127 ("For more information, please see the attached SIS Fact Sheet."); Plaintiffs' Exhibit 41 (SIS fact sheet). Neither the Notice itself nor the fact sheet tells the recipient: (1) that the SIS assessment may result in the reduction or termination of Medicaid benefits or services; (2) the exact nature of the SIS assessment and how to prepare for it; or (3) how to contest the results of the SIS assessment. *See* Plaintiffs' Exhibit 61; Plaintiffs' Exhibit 41. After the SIS assessor conducts the interview, the result of the SIS assessment is a raw, numerical SIS score. Maharaj Depo at 14.

Second, the numerical SIS score may or may not be reviewed by DDSD in what is called the "verification process." TR at 259 (Stevenson). No one from the State of New Mexico informs DD Waiver recipients, their case managers, and their guardians of the verification process meeting or invites them to provide input. TR at 27-28 (Faubian). Initially, the State informed DD Waiver recipients after the fact that their score had undergone verification; eventually, however, the State stopped providing recipients with that information. *See* Plaintiffs' Ex. 76; TR at 495-96 (Cubra). The verification process is an opportunity for DDSD staff to apply their "clinical judgment" to the question of what supports a DD Waiver recipient may need. TR at 451-52 (Hill); Plaintiffs' Ex. 80.[5] However, the program description of the SIS provided by Defendants

---

[5] Plaintiffs' Exhibit 80 is one of the subjects of Plaintiffs' pending motion to compel, Doc. No. 102. The Court has referred to Exhibit 80, which Plaintiffs offered into evidence at the hearing without objection by Defendants, for the narrow and limited purpose for which it is cited herein. At this time, the Court expresses no opinion as to the waiver of any privilege by Defendants or any other issue raised by the motion to compel, Defendants' response, or Plaintiffs' reply.

to DD Waiver recipients and to the public provides no explanation of the verification process. *See, e.g.,* Plaintiffs' Ex. 41; TR at 258 (Stevenson). Further, it appears that the only way for a recipient to find out what happened at his or her SIS verification is to make a public records request to obtain documentation of the meeting. TR at 493-95 (Cubra). There is nothing in the record that shows that Defendants have informed DD Waiver recipients of that fact.

Next, the raw SIS score is subjected to an algorithm that places the DD Waiver recipient in one of seven groups. These range from Group A, comprised of people requiring the fewest supports, through Group G, comprised of individuals with the most extreme or complex needs. TR at 261-63 (Stevenson); Plaintiffs' Ex. 62 at P100143-44; TR at 440-41 (Burns). Each group assignment is accompanied by a service package for therapies and services. *See* TR at 46 (Faubion); 441 (Burns); 651, 657 (Rodriguez). As further discussed below, the interdisciplinary team for a DD Waiver recipient eventually must submit to the State a budget that is within the service package the group assignment, even if that team believes that it cannot provide the recipient with adequate services within that budget. TR at 657-58 (Rodriguez).[6]

Third, the DD Waiver recipient, guardian, and case manager receive notice of the recipient's SIS Group assignment.[7] The notice contains a statement that the recipient may request a reassessment of the SIS score, and a statement that the recipient can apply for a fair hearing. TR at 29 (Faubion); Plaintiffs' Exs. 126, 135. The case manager is expected to share that

---

[6] There is a separate SIS category, called Group H, that is not determined by the SIS assessment process but rather by individual application. TR at 51-52 (Faubion). Group H is for DD Waiver recipients with exceptional needs who require additional services not covered by their SIS Group assignment. *Id*.; TR at 441 (Burns). If the Group H application is granted, the recipient remains in his or her SIS Group but also may receive some additional hours of service. *Id*. at 52 (Faubion).

[7] Before December of 2013, Defendants sent the notice of SIS group assignment only to case managers, who are contractors paid for by the State of New Mexico, and not directly to DD waiver recipients or their legal guardians. *See* TR at 606, 623-24 (Rodriguez).

information with the DD Waiver recipient and his or her guardian, as well as explain the recipient's legal rights. TR at 25 (Faubion); TR at 605-06 (Rodriguez). Until sometime in July of 2013, the notice of the group assignment provided only that the DD Waiver recipient could seek a reassessment or a fair hearing "[i]f you do not agree that the SIS process was followed in accordance with the enclosed[8] procedures." *See, e.g.,* Plaintiffs' Exs. 76 and 95. However, after July of 2013, the State began changing the notice of fair hearing to provide more detailed and accurate information. TR at 303-04 (Stevenson). As exemplified in Plaintiffs' Exhibit 125, at page SF 000001, dated July 25, 2013, Defendants added language stating that the DD Waiver recipient or his guardian may request a reassessment or a fair hearing if the "enclosed SIS procedures" were not followed, or "[i]f you do not agree with your NM DDW Group Assignment," meaning Groups A through G. Plaintiffs' Exhibit 125; TR at 503-04 (Cubra). However, the form does not explain what the SIS score or Group Assignment means in terms of how it affects the DD Waiver recipient's benefits or budget. It does not state that a recipient may seek a fair hearing whenever there is a suspension, termination, or reduction of Medicaid services. The revised notice does not inform the DD Waiver recipient that his failure to act will result in a reduction or termination of services. It appears to limit the issues that can be raised at a fair hearing to two—proper application of SIS procedures, and group assignment. Finally, both the original and the revised the fair hearing notices state that if the DD Waiver recipient seeks a reassessment, the second SIS score will be binding on the recipient, even if the score results in a Group assignment that dictates an even deeper reduction in the recipient's benefits. Plaintiff's

---

[8] Based on the record currently before the Court, it is not clear that any SIS procedures were in fact enclosed with the notices. In the case of at least one DD Waiver recipient, S.W., it appears that the State in fact did not enclose those procedures with her fair hearing notice. Plaintiffs' Exhibit 76; TR at 499-501 (Cubra).

Exs. 76, 95, 125. This language certainly could discourage recipients and their guardians from seeking a reassessment.

The SIS Group assignment comes from the recipient's numerical score on the SIS assessment, and in some cases is also based on the State's supplemental questions and/or the verification process.TR at 455 (Hill); Plaintiffs' Ex. 80. Therefore, providing a DD Waiver recipient with only his or her numerical SIS score and Group Assignment, without also providing information about how the supplemental questions and verification process may have affected the results, does not provide the recipient with a complete picture of how a decision was reached in his or her case. The fair hearing notices sent to DD Waiver recipients do not explain the verification process or the impact of supplemental questions, nor do they inform recipients of any opportunity to contest the SIS score or the verification process (if one has occurred). Plaintiffs' Exh. 29, 63, 67, 75, 76, 88, 89, 94, 95, 119, 125, 126, 134, and 135.

Prior to June 2014, DD Waiver recipients who applied for and received a partial denial for the Group H exception—*e.g.,* they were granted fewer hours than they requested—had no ability to appeal the partial denial. TR at 52-53 (Faubion). Rather, the fair hearing notice for denial of the H application states in part, "[t]he request for ongoing therapy does not meet the criteria of extenuating circumstances or extremely complex needs," but does not explain what those criteria are. Plaintiffs' Ex. 101. On June 1, 2013, the State adopted a definition of both phrases, but those definitions were never provided to DD Waiver recipients in their notices of denial of Group H applications. TR at 358-59 (Stevenson); Defendants' Ex. YY. The State also promulgated a policy on Group H assignment procedures, but there is no evidence that this policy was ever provided to applicants for Group H services either. *See* TR at 359 (Stevenson).

The DD Waiver recipient's case manager receives a notice of a "package of benefits" for the DD Waiver recipient that is commensurate with his SIS Group assignment. The Group Assignment may ultimately result in the reduction or termination of both 24/7 residential services and the recipient's therapies. For example, a person assigned to Group A or B will not receive such 24/7 residential services, including supported living and family living. TR at 66-67 (Faubian); 222, 224-26, 289-90 (Stevenson). The record does not reflect any document whereby the State of New Mexico informed the DD Waiver recipient of this potential reduction or termination of benefits until the budgeting process is complete.

In the fourth step of the process, a DD Waiver recipient may request a second SIS assessment, also called a reassessment. The SIS reassessment is intended to be a safeguard against incorrect evaluations of a DD Waiver recipient's support needs. TR at 247 (Stevenson). It is also an opportunity for the SIS assessor to review documents pertaining to the recipient's needs which were not available to the assessor who conducted the original SIS. Maharaj Depo. at 24-25, 67-69. According to DOH policy, effective December 3, 2013, a DD Waiver recipient may receive a reassessment only if he "believes the administration of the SIS interview did not substantially follow the guidelines for documenting a SIS assessment." Defendants' Exhibit WW; TR at 360 (Stevenson). The only other avenue to a reassessment is a "significant change in condition" for the DD Waiver recipient." *Id.* There is no right to a SIS reassessment if the recipient believes that he or she was placed in the wrong group unless one of the two listed conditions is met and is the cause of the incorrect placement; one may not merely challenge the SIS score as incorrect. TR at 360-61 (Stevenson).

While the SIS assessor does not review any documents concerning the DD Waiver recipient during the first assessment, he does so as part of the reassessment. Maharaj Depo. at

24-25, 69. Only the State, and not the DD Waiver recipient or his representatives, has input into what documents the assessor should review prior to the reassessment. Maharaj Depo. at 31-32. In both the initial assessment and the reassessment, the SIS assessor uses his "clinical judgment" to resolve inconsistencies in the responses to questions on the assessment. *Id*. at 68-69.  Again, however, the Notice of Reassessment does not inform the recipient that the assessor will review documentation and make a clinical judgment regarding the validity of the respondents' dispute concerning the answers to particular questions at the first SIS assessment. *See, e.g*., Plaintiffs' Exs. 63, 66. DD Waiver recipients may neither request nor receive a third SIS assessment on the grounds that a prior assessment led to an incorrect score or group placement. TR at 58-59 (Faubion); 164 (Wray). Rather, it appears that only a change in the recipient's health or safety needs may justify a third SIS assessment. TR at 233 (Stevenson), 507 (Cubra),

Fifth, a DD Waiver recipient may request a fair hearing. However, the recipient may not challenge his SIS score or group placement at the fair hearing. TR at 32 (Faubion), 257-58 (Stevenson). Rather, according to the State's SIS Fact Sheet, "[a]n individual has the right to a fair hearing when the recipient alleges that the SIS interviewer did not substantially follow the guidelines for conducting a SIS assessment or the recipient alleges that the associated service package does not adequately meet their health and safety needs." Plaintiff's Ex. 41. A training document provided by the State to case managers, interdisciplinary teams, and individuals similarly restricts the basis for a fair hearing, stating that a recipient who believes that the SIS interview did not follow the proper procedures for conducting the SIS assessment may seek either a SIS reassessment or "a fair hearing request related to the administration of the SIS." Plaintiffs' Ex. 42 at RRFP 1-000488; TR at 258-59 (Stevenson).

The State of New Mexico's regulations regarding the fair hearing process have been a source of some confusion as to the scope and purpose of the fair hearing afforded to DD Waiver recipients. A *general* regulation regarding fair hearings for Medicaid recipients provides for a fair hearing in a broad array of  circumstances, stating that an "adverse action" for which an individual may request an appeal or administrative hearing includes "the denial or reduction . . . of an authorized service or item, including level of care . . ." NMAC 8.352.2.10. However, neither a citation to NMAC 8.352.2.10, nor any reference to its provisions, appears on any fair hearing notice provided to DD Waiver recipients. On the other hand, those notices *do* refer to the former State regulation pertaining *specifically* to fair hearings for DD Waiver recipients, found at NMAC 8.314.5.18.[9] That regulation, which was in effect until June of 2014 and which therefore affected the fair hearing rights of several named Plaintiffs as well as members of the Plaintiff organizations, stated that it was "meant to be more specific than 8.352.2 NMAC and will be the controlling rule for any conflicts with 8.352.2 NMAC." It provided DD Waiver recipients with a fair hearing under circumstances that were much narrower than NMAC 8.352.2.10. It stated that recipients may request an administrative hearing "on the following circumstances," which included that the DD Waiver recipient did not meet the requirements for waiver services, that "the SIS interviewer did not substantially follow the standard procedures (as found in the DD Waiver service standards) for conducting a SIS assessment," or that the recipient's assigned "service package does not adequately meet the health and safety needs of the eligible recipient." Thus, it limited the reasons for which one could seek a fair hearing to only those enumerated therein. Perhaps most importantly, the former NMAC 8.314.5.18 also provided, with regard to

---

[9] NMAC 8.314.5.18 has been superceded by NMAC 8.314.5.19, which simply states: "HSD/MAD must grant an opportunity for an administrative hearing pursuant to 42 CFR Section 431.220(a)(1) and (2), Section 27-3-3 NMSA 1978, and 8.352.2 NMAC."

any challenge to the service package, that "[t]he DD Waiver eligible recipient must develop and submit a budget within the NM SIS group placement and will receive a notice of fair hearing rights *along with* the decision regarding the proposed budget." *Id*. (emphasis added). Thus, it put the DD Waiver recipient in the position of having to prepare a budget that fits within the service package for the SIS group assignment that he or she had not yet had the opportunity to challenge on substantive grounds. This former regulation applied to all SIS assessments that occurred before June of 2014, which includes more than 4,000 individuals. TR at 237, 346, 354, 358 (Stevenson); 589-90 (Medrano).

The Defendants' stance on the scope of fair hearings can be seen in the exhibits offered into evidence at the preliminary injunction hearing. For example, in August of 2012, Defendant Cathy Stevenson (Director of the Disabilities Supports Division of the New Mexico Department of Health), along with Jim Green (then the Deputy Secretary of the Department of Health), wrote a letter to a behavior therapist who had opined that if a DD Waiver recipient receives a SIS score that results in a decrease in services from those received under the former ABS system, that recipient should be given specific notice of a right to a fair hearing to contest the reduction in services. TR at 366-67 (Stevenson); Plaintiff's Ex. 143. In response, Stevenson and Green wrote, "The Department of Health does not agree with this argument and does not believe that individualized notice of the anticipated decrease in services is required, either by HSD regulations or by due process." TR at 367; Plaintiff's Ex. 143. While the Defendants no longer take this position, this was their position in 2012. TR at 368 (Stevenson).  In addition, in the Summary of Evidence provided for Plaintiff S.F.'s fair hearing, the State did not include any reference to the general fair hearing regulation, NMAC 8.352.2.10, but only to the much more restrictive NMAC 8.314.5. Defendants' Ex. KKK, Bates No. 000575-77.

Notwithstanding the foregoing, Defendants have argued that in practice DD Waiver recipients still retained their broader fair hearings rights under the general Medicaid regulation, NMAC 8.352.2.10, despite the narrow language of NMAC 8.314.5.18 that the State cited in fair hearing notices it sent to recipients. The evidence, however, suggests that even if the option of a broader fair hearing under NMAC 8.352.2.10 existed in the minds of Defendants, *see* TR at 278-80 (Stevenson), it did not exist in reality for DD Waiver recipients. In fact, NMAC 8.352.2.10 bore little relationship to the fair hearing process for DD Waiver recipients prior to June of 2014. First, the typical fair hearing notices sent to DD Waiver recipients contained a reference to NMAC 8.314.5.18, but none to NMAC 8.352.2.10. TR at 280-83 (Stevenson); Plaintiffs' Exs. 88, 89, 94, 95, 119. It is unclear how the State could reasonably believe that a recipient could assert rights under a regulation of which he or she received no notice. In fact, nothing in the written record shows that prior to July of 2014, Defendants informed DD Waiver recipients of their broader fair hearing rights under the general fair hearing regulation, NMAC 8.352.2.10. TR at 370 (Stevenson). Second, the old version of NMAC 8.314.5.18 explicitly states that "[t]his rule is meant to be more specific than 8.352.2 NMAC and will be the controlling rule for any conflicts with 8.352.2 NMAC." This language could reasonably be interpreted by a layperson, or by anyone for that matter, to suggest that the specific reasons for a fair hearing under NMAC 8.314.5.18 supersede the more general right to a fair hearing under NMAC 8.352.2.

In July of 2014, the State published the current regulation pertaining to fair hearings for the SIS assessment process. TR at 236, 293 (Stevenson). Unlike its predecessor, NMAC 8.314.5.19 does allow DD Waiver recipients to contest their SIS scores, and it refers specifically to the recipient's right to a fair hearing under the general Medicaid regulation, NMAC 8.352.2.

TR at 293. However, as stated above, more than 4,000 individuals have not received the benefit of these fair hearing rights.

Defendants have taken the position that at fair hearings relating to the SIS process, HSD has not opposed the introduction of evidence by DD Waiver recipients that the recipient's SIS score was wrong, the SIS assessor made factual errors, the group assignment was improper, or the decision was otherwise incorrect. Rather, the State's position at the preliminary injunction hearing appears to be that a DD Waiver recipient could raise any issue at the fair hearing. TR at 460-61 (Hill); 636-37 (Rodriguez).

However, there is evidence to the contrary from actual fair hearings. For example, at Plaintiff D.S.'s fair hearing, D.S.'s family wished to challenge both how the SIS was conducted and the group assignment that he received as a result of the SIS. Defendants' Ex. HHH at D.S. 000414. A representative from the State opined that "at this point in time the only thing that can be brought to fair hearing is if the SIS assessment was done according to the policies and procedures." *Id.* at 000412. A second State representative agreed on the grounds that DS had not yet developed a budget for the SIS group assignment he was contesting, such that the only thing that could be disputed was the proper administration of the SIS. *Id.* at 000413, 432, 434. Apparently, the hearing officer was persuaded by the State's position, as she stated in her decision that the issue on appeal was whether the SIS interviewer substantially followed the standard procedures for conducting the SIS. *Id.* at 000388.

The State successfully advocated for similar restrictions on the scope of Plaintiff L.D.'s fair hearing. For example, the representative of the State objected when L.D.'s attorney asked what criteria the SIS assessor considers when assigning a respondent's score in the "exceptional behavioral support needs" category of the SIS, arguing that question was outside the scope of the

fair hearing, which should be limited to whether the SIS procedures were followed. Plaintiff's Ex. 144; TR at 640-45 (Rodriguez). Further, L.D. could not meaningfully challenge whether her budget met her health and safety needs because the State would not let her residential care providers attend L.D.'s fair hearing unless they took personal leave time to do so. TR at 170-71 (Wray).

At Plaintiff B.W.'s fair hearing, the State raised similar objections to questions about the criteria and information that the SIS assessor considered in arriving at B.W.'s SIS score. Plaintiff's Ex. 146 ("I believe you're touching on the process by which we use the SIS assessment to make our resource allocation decision. And it is my understanding that this is not under scrutiny or an issue that could be appealed."); *see also* TR at 645-47. The foregoing is consistent with the State's own "SIS Fact Sheet," (Plaintiff's Ex. 41), which it distributed to DD Waiver recipients and which stated that fair hearings were for those who felt that the SIS assessor did not substantially follow the SIS guidelines or their service package did not meet their health and safety needs.

The final step in the SIS assessment process is that the DD Waiver recipient and his or her interdisciplinary team must develop and submit a budget to Molina Healthcare, the private insurance provider for Medicaid. TR at 587 (Medrano). The applicable regulation in effect until June of 2014, *see* TR at 589-90 (Medrano), NMAC 8.314.5.18, provided in part that if the recipient wished to assert that the service package accompanying his group assignment does not meet his health and safety needs, then "[t]he DD Waiver eligible recipient must develop and submit a budget within the NM SIS group placement and will receive a notice of fair hearing rights along with the decision regarding the proposed budget." Thus, the regulation forced a recipient to develop a budget for a service package that he felt was unsafe before he could be

heard on the issue of safety. Under that regulation, even if the interdisciplinary team believed that the service package accompanying a particular SIS group assignment was not adequate for the recipient, the team still had to submit a budget that was within the parameters of the group assignment. TR at 657-58 (Rodriguez). Molina approves the budget and sends it to the case manager, not to the DD Waiver recipient or his guardian. TR at 676-77 (Faubion). Thus, the recipient and guardian do not receive notice that a budget has been approved and may be appealed. *Id.* Confusingly, after Molina approves a budget submitted by the DD Waiver recipient, he may request a fair hearing to challenge it on the grounds that it does not adequately meet his safety needs. *See* TR at 593-94 (Medrano); NMAC 8.314.5.18(A)(3) (now withdrawn). Thus, the burden is on the recipient to both recognize the limited opportunity to "undo" the budget he or she just created, and to mount a collateral attack on the SIS score that dictated that budget. *Compare* TR at 593-94 (Medrano). There is nothing in the record to explain how a DD Waiver recipient may go about making this challenge.

Further, if a recipient wishes to challenge the correctness of his SIS score or resulting SIS Group assignment, nothing in the "post-budget" fair hearing process appears to permit such a challenge. However, the SIS assessors do not attend the fair hearings, so the DD Waiver recipients have no ability to question them regarding factual disputes that may underpin the SIS score. Further, recipients have no right to subpoena witnesses at fair hearings. TR at 168 (Wray).

**Individual Plaintiffs**

Plaintiff L.D. has Prader-Willi syndrome, which causes her to eat compulsively; this includes eating non-food items. She wanders away from her house, usually in search of food, and she sometimes becomes aggressive and agitated. TR at 61-62 (Faubion). L.D.'s first SIS

assessment placed her in Group D; after a reassessment, she was placed in Group C, meaning she would receive even fewer benefits. TR at 62, 65, 163 (Faubion); Plaintiffs' Ex. 134. The ARC, as L.D.'s guardian, disagreed with how the SIS assessor evaluated the respondents' answers to the SIS questions and felt that the SIS assessor disregarded or minimized their responses. TR at 164-66 (Wray).

Plaintiff S.K. also has Prader-Willi syndrome; he aggressively tries to break into cabinets or wanders away in search of food, requiring the efforts of caregivers to monitor and restrain him. TR at 67-68 (Faubion). S.K.'s first SIS assessment led to a Group B assignment, and his reassessment placed him in Group C. TR at 79-80. In view of the decrease in services he has received as a result of this classification, SK is showing signs of increasing interest in eloping and stealing food. TR at 69 (Faubion).

Plaintiff S.F., a 24-year-old woman with Down syndrome, has been on the DD Waiver since she was 9 years old. TR at 105 (Friedman). S.F. functions as a child under ten years old, and has a history of setting fires, wandering from home, and having trouble interacting appropriately with strangers. *Id*. at 106-07. As a result, S.F. cannot be left unsupervised. *Id*. at 106. She receives speech therapy because she has trouble making herself understood. *Id*. at 108. S.F.'s SIS assessment and reassessment both resulted in assignment to Group B. *Id*. at 109. As a result, S.F.'s speech therapy hours will be reduced, her day habilitation hours will be decreased, and her family living services will be eliminated. *Id*. The notice of SIS score that S.F. received does not explain how the State arrived at a decision to assign the recipient to a particular Group. *See, e.g*., TR at 133 (Friedman). Finally, the notice of Group assignment that S.F. received does not inform her that her family living 24/7 services are being eliminated, or that she must choose

one therapy and can no longer receive the other two therapies she previously received. Defendants' Ex. KKK at SF000005.

A.W. is not a named plaintiff, but The ARC is her guardian. TR at 70 (Faubion). A.W. is moderately developmentally disabled, and had a kidney transplant several years ago. *Id*. A.W. was placed in Group A or B, and lives with another developmentally disabled woman. *Id*. A.W. cannot take care of herself, and the services she is receiving under her current SIS Group are not adequate. However, A.W.'s roommate has staff support around the clock, and those individuals help with A.W.'s medication management, monitoring A.W.'s water intake and diet, and other services she cannot do on her own, even though her roommate's staff are not being paid to do so. *Id*. at 71. A.W. is vulnerable because if her roommate moves out, she will no longer receive these supports. *Id*.

Plaintiff A.J., a 23-year-old female, has Williams syndrome, which results in a variety of physical problems as well as light mental retardation. TR at 559-60 (Petros). She wanders off when left alone, and is vulnerable to exploitation by strangers. *Id*. at 560. Prior to her SIS assessment, A.J. was receiving occupational, behavioral, and speech therapy. *Id*. at 561-62. However, A.J. has been assigned to Group B, and as a result she has lost speech therapy. *Id*. at 563. Since that time her ability to speak has deteriorated. *Id*. at 564-65. Her family living services have also been severely reduced, and as a result she cannot participate as much in Special Olympics or have as many outings in the community. *Id*. at 563-64, 575-76**.** As a result, A.J. has switched to a different Medicaid developmental disability waiver program called Mi Via. TR. at 559 (Petros). Like the DD Waiver, Mi Via is a home and community-based alternative to institutional care. TR at 341 (Stevenson). However, it provides for a broader range

of services and grants recipients greater control over hiring, supervising, and firing direct support staff. *Id*.

C.P. is a 28-year-old male with Down syndrome who is a DD Waiver recipient. TR at 542-43 (Proo). C.P.'s parents help him with hygiene, nutrition, money management, medications, and his CPAP machine. *Id*. at 543-44. C.P. receives family living services—around the clock services paid for by the DD Waiver, which his mother believes that he needs. *Id*. at 545. C.P.'s first SIS assessment resulted in his assignment to Group A, though a reassessment placed him in Group B. *Id*. at 546.

C.L. also has Down Syndrome; he cannot read or write, gets lost easily, and cannot safely cross the street by himself. TR at 137 (Richards). His family leaves him alone only to wait for the van that takes him to work in the morning. *Id*. at 138. C.L.'s first SIS assessment resulted in a Group B assignment. TR at 141-42; Plaintiffs' Ex. 62. However, C.L.'s caregivers did not know that the Group B assignment would result in a major reduction in his supports until nine months later, when they received the budget. TR at 141-43; Plaintiffs' Ex. 64. They felt that the first SIS assessment had resulted in an error. *Id.* at 144. C.L.'s family was not asked to provide relevant documentation for the SIS reassessment. *Id*. at 145. Realizing they needed to learn more about the SIS process, C.L.'s family members arranged to take SIS respondent training, contacted legal counsel, and performed independent internet research on the SIS. *Id*. at 147-48. After an extremely lengthy and arduous reassessment—which lasted six and a half hours, and consisted of a great deal of arguing and negotiating between C.L.'s parents and the SIS assessor—C.L. was assigned to group D. TR at 149-50.

While not a named plaintiff, S.W. is a female in her late 40's who has several medical problems, including pulmonary arterial hypertension. TR at 487 (Cubra). She has been receiving

around-the-clock family living services at a residential level of support since 2007. *Id.* S.W. was initially assigned to SIS Group B, and her request for Group F (extraordinary medical need) was rejected, which means that she would not receive around-the-clock support. Plaintiff's Ex. 75. According to the State's notice, the results of S.W.'s first SIS assessment were subject to the verification process. Plaintiffs' Ex. 75. As part of that process, the verifier appears to have examined documents relating to S.W.'s medical conditions, summarized them, and concluded that the documents did not support a conclusion that she has sufficient extraordinary medical need to justify placement in Group F. Plaintiff's Ex. 73; TR at 490-91 (Cubra). The State did not inform S.W. what documents had been reviewed that led the verifier to the conclusion that she did not qualify for Group F; rather, her attorney had to request the documents that reveal that information. *See* Plaintiffs' Ex. 76; TR at 487-88, 493-94 (Cubra). Thus, neither before nor after the verification process did S.W. or her guardian receive notice that the reason S.W. was denied an assignment to Group F was that no one had submitted documentary evidence of S.W.'s risk of sudden death. In addition, S.W.'s attorney requested that both the SIS assessor and verifier (both employees of the State) attend S.W.'s fair hearing, but both the Department of Health and HSD declined to provide them as witnesses. TR at 522. Finally, at S.W.'s fair hearing her attorney attempted to introduce evidence that the SIS assessor failed to record correct answers to questions posed to respondents regarding S.W.'s needs during S.W.'s SIS assessment. TR at 531-32. However, the attorney for the DOH successfully objected to such evidence, and it was excluded. *Id.*

**E.    Analysis and Conclusions of Law**

      **1.    Substantial Likelihood of Success on the Merits**

First, the Court must decide whether Plaintiffs have demonstrated a substantial likelihood of success on the merits of their claim that the procedures used by Defendants in the implementation of the SIS assessment process have violated their procedural due process rights. The Court concludes that Plaintiffs have met that heavy burden by making the requisite "strong showing."

As discussed in Part IV(C), *supra*, DD Waiver recipients are entitled to a pre-deprivation notice and opportunity to be heard that satisfies the standard set by the Supreme Court in *Goldberg v. Kelly*, 397 U.S. 254 (1970). In *Goldberg*, the State of New York provided two levels of procedural protection for welfare recipients at risk for loss of benefits. First, a caseworker evaluated the recipient's continued eligibility. If he had doubts, he was required to discuss them with the recipient. If the caseworker concluded that the recipient was no longer eligible, he recommended termination of aid to a unit supervisor. *Id*. at 258-59.  If the supervisor agreed, he sent the recipient a letter stating the reasons for proposing to terminate aid and notifying him that within seven days he may request that a higher official review the record, and may support the request with a written statement prepared personally or with the aid of an attorney or other person. *Id*. at 259. The state provided "notice to the recipient of the reasons for a proposed discontinuance or suspension [of benefits] at least seven days prior to its effective date, with notice also that upon request the recipient may have the proposal reviewed by a local welfare official holding a position superior to that of the supervisor who approved the proposed discontinuance or suspension, and, further, that the recipient may submit, for purposes of the review, a written statement to demonstrate why his grant should not be discontinued or

suspended." 397 U.S. at 258.  In the second stage, if the welfare recipient was unsuccessful at this pre-deprivation hearing, he could request a post-termination fair hearing before an independent state hearing officer at which the recipient might appear personally, offer oral evidence, confront witnesses against him, and have a record made of the hearing. *Id*. at 259-60.

The Supreme Court found that the process failed to satisfy constitutional requirements of due process. The pre-deprivation *notice* was not unconstitutional *per se*, as the state provided "both a letter and a personal conference with a caseworker to inform a recipient of the precise questions raised about his continued eligibility," including the legal and factual bases for the state's doubts. *Id*. at 268. However, the Court concluded that the pre-deprivation hearing procedure itself was faulty:

> The city's procedures presently do not permit recipients to appear personally with or without counsel before the official who finally determines continued eligibility. Thus a recipient is not permitted to present evidence to that official orally, or to confront or cross-examine adverse witnesses. These omissions are fatal to the constitutional adequacy of the procedures.

*Id*. at 268. Thus, the pre-deprivation hearing must permit the welfare recipient to appear in person with an attorney, to present evidence, and to cross examine adverse witnesses.

Furthermore, personal characteristics of the welfare recipient are relevant. As the Supreme Court noted, "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Id*. at 268-69.  The Court reasoned that merely giving welfare recipients the opportunity to present their case in writing is "unrealistic" for most, as they may not be well educated and are less likely to obtain professional assistance. *Id*. at 269. "Moreover, written submissions do not afford the flexibility of oral presentations; they do not permit the recipient to mold his argument to the issues the decision maker appears to regard as important." Thus, the Court concluded that a full hearing, conducted in person with the

opportunity to present evidence and confront adverse witnesses, was essential for a pre-deprivation hearing. *Id*. at 268-69.

The *Goldberg* court also provided guidance regarding the nature of the decision that the government must provide to a welfare recipient. First, "the decisionmaker's conclusion as to a recipient's eligibility must rest solely on the legal rules and evidence adduced at the hearing." *Id*. at 271. As a result, the hearing officer or other decision maker should "state the reasons for his determination and indicate the evidence he relied on, though his statement need not amount to a full opinion or even formal findings of fact and conclusions of law." *Id*. at 271. (internal citations and quotations omitted).

The Court concludes that Plaintiffs have met their heavy burden by making a strong showing that they have a substantial likelihood of success on the merits of their claim that Defendants have violated Plaintiffs' rights under the procedural due process clause and the Medicaid Act.

First, the SIS assessment and reassessment are essentially fact-finding proceedings to determine the level of benefits to which the DD Waiver recipient is entitled. As such, the SIS assessment and reassessment may result in a loss of benefits. Recipients are entitled to adequate notice before the first SIS assessment that it could result in a reduction of benefits. They are also entitled to notice of how the assessment will be conducted and what criteria will be used to evaluate their entitlement. *See Goss v. Lopez*, 419 U.S. 565, 579 (1975) ("The fundamental requisite of due process of law is the opportunity be heard, a right that has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to . . . contest." (internal quotation marks and citation omitted). On the record before the Court, such notice was not provided to Plaintiffs in violation of the right to due process.

Second, at the reassessment the SIS assessor may make factual findings regarding the DD Waiver recipient. However, at the reassessment the State has exclusive authority to dictate what documentary evidence the assessor will consider regarding the recipient's claim for benefits; the DD Waiver recipient has no right to submit documents for the assessor's consideration. In other words, the decision is based solely on the written record, and that written record is entirely one-sided. Again, because the assessor's findings directly impact the recipient's benefits, this violates due process as explained in *Goldberg*.

Third, the "verification" process, in which Defendants may review and change a recipient's SIS score and of which DD Waiver recipients are given no notice or opportunity to participate, violates due process. During verification, the State may evaluate whether there is adequate evidence to support a particular factual assertion by the recipient and the respondents. It does so unilaterally, without the participation (and sometimes even the knowledge) of the DD Waiver recipient. A change in the recipient's SIS score as a result of verification may result in a different Group assignment and a decrease in the level of benefits. Again, this violates the procedural due process rights of DD Waiver recipients, who must be permitted to participate as set forth in *Goldberg*.

Fourth, Defendants have not given proper notice to DD Waiver recipients regarding the outcome of the SIS and its potential effect on his or her benefits. For example, when they inform recipients of the results of the SIS assessment, Defendants have not given recipients notice that their SIS score and assigned Group may result in a loss of benefits. In addition, Defendants have not given recipients adequate notice that they can challenge their SIS score or their Group assignments, both of which directly affect benefit levels, at a fair hearing. *See* 42 C.F.R. § 431.220. Defendants have not informed recipients that they may challenge the factual findings

made by a SIS assessor at a fair hearing, or indeed any action they believe Defendants have taken erroneously. *Id*. at § 431.220(a)(2). Instead, under the former regulations, Defendants informed many recipients merely that they can appeal if they believe that the State's own SIS procedures have not been substantially followed by the SIS assessor, NMAC 8.314.5.18(A)(2), which is a much narrower basis for appeal. It is well established that notice is ineffectual "unless one is informed that the matter is pending and can choose for himself whether to . . . contest." *Goss v. Lopez*, 419 U.S. 565, 579 (1975). Defendants did not give those DD Waiver recipients notice of the factual issues that had been resolved by the SIS assessor that had resulted in the reduction or elimination of benefits, leaving recipients with inadequate information to mount a successful appeal of the assessor's decision. Finally, until relatively recently, Defendants sent the results of SIS assessments only to case managers (who work for the State) and not to DD Waiver recipients and their guardians, a process that did not ensure that the recipients themselves received notice of an important procedural step in the determination of their benefits. As the Tenth Circuit has found, "when the government entirely fails to give notice of a claim, or delays so excessively in providing notice that the party's ability to mount a defense is impaired, due process is offended regardless whether the party can show prejudice." *Energy West Mining Co. v. Oliver*, 555 F.3d 1211, 1219 (10th Cir. 1999). All of these things violate DD Waiver recipients' rights to procedural due process.

Fifth, the fair hearings provided by Defendants for appealing the decision of the SIS assessor are constitutionally inadequate. There is evidence in the record that Defendants have actively and successfully opposed recipients' ability to challenge at fair hearings the factual findings reached by SIS assessors, as well as the accuracy of SIS scores and Group assignments. As supported in the record, at times SIS assessors and respondents have had disagreements about

the facts regarding a DD Waiver recipient's needs and abilities. SIS assessors have the authority to resolve those disagreements as they see fit, but DD Waiver recipients have no viable mechanism for challenging those findings at a fair hearing. They also have not been permitted to challenge their Group assignment or SIS score, which often results in a change in the level and duration of the benefits they receive. This violates due process because recipients are not afforded an opportunity to be heard on these matters. As the applicable regulations provide, a DD Waiver recipient must be permitted to appeal whenever there is any denial, delay, or modification of his services, or error regarding his care. 42 C.F.R. § 431.220(a)(1) and (2).

Sixth, the regulations promulgated by Defendants do permit a DD Waiver recipient to contest the service package provided by his Group assignment if he believes it does not adequately meet his "health and safety needs." NMAC(A)(3) 8.314.5.18(A)(3). However, the recipient may present this challenge only after he submits a budget based upon his SIS Group placement and the State has already rendered a decision as to his benefits. This places the burden on the DD Waiver recipient to recognize the limited opportunity to challenge the budget he and his interdisciplinary team have recently created, as well as to understand how to mount a collateral attack on that budget. This opportunity to challenge the appropriateness of the services comes only after benefits have been denied or decreased, and as such it is akin to a delayed post-deprivation hearing contrary to *Goldberg*. And once again, at that point the recipient has no opportunity to challenge his Group assignment or SIS score.

### 2.    Plaintiffs Will Suffer Irreparable Harm

The second factor in determining whether to issue a preliminary injunction is whether irreparable injury to Plaintiffs is likely without the preliminary injunction they request. "A plaintiff suffers irreparable injury when the court would be unable to grant an effective monetary

remedy after a full trial because such damages would be inadequate or difficult to ascertain." *Dominion Video Satellite, Inc. v. EchoStar Satellite Corp.*, 269 F.3d 1149, 1156 (10th Cir. 2001). Furthermore, "[w]hen an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Kikumura v. Hurley*, 242 F.3d 950, 963 (10th Cir. 2001) (quotations omitted); *Statharos v. N.Y. City Taxi and Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 2948.1 (2d ed. 1995). *Cf. Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.").

For the reasons discussed in Part E(1), *supra*, the Court concludes that Plaintiffs have shown a very high likelihood of success on the merits of their claim that the State's current procedures run afoul of DD Waiver recipients' rights under the Due Process Clause of the Constitution. Accordingly, this strong showing of the deprivation of Plaintiffs' constitutional rights satisfies the irreparable harm requirement.

Furthermore, Plaintiffs are all developmentally disabled persons who, during the relevant time period were DD Waiver recipients. As such, the State has deemed them physically and/or mentally disabled to the point of requiring some level of medical services and/or living support to meet their basic needs. Defendants argue that it is speculative whether a reduction in those services will cause Plaintiffs to experience irreparable harm. However, the Court concludes that the most reasonable inference from the evidence presented by these disabled individuals is that a reduction in their benefits and services will likely result in harm to their physical and/or mental wellbeing.

### 3.      Irreparable Harm Outweighs Any Prejudice to Defendants

Next, the Court must determine whether any irreparable harm to Plaintiffs that will occur if a preliminary injunction is not granted outweighs any prejudice to the Defendants that the injunction may cause. The Court concludes that it does.

Defendants argue that the grant of a preliminary injunction in this case will force the State to deviate from the CMS-approved State Medicaid plan without prior approval, thereby violating the Medicaid Act or risking that New Mexico will be suspended from receiving federal Medicaid funds. *See* Doc. 20 at 16. However, the Court does not agree with Defendants that Plaintiffs are requesting an injunction forcing the State to abandon the SIS and to return to the former ABS model of allocating benefits. That is not how the Court reads the request for relief in Plaintiffs' motion for preliminary injunction. *See* Doc. 11 at 33. Plaintiffs are not asking the Court to order Defendants to abandon the SIS, but rather to order Defendants to administer the SIS and the fair hearing process in a manner that provides DD Waiver recipients with the due process to which they are entitled. Further, Plaintiffs are requesting a return to their pre-SIS benefit levels until such time as Defendants provide the due process required by law.

Next, Defendants argue that an injunction would cause the State a hardship by frustrating the process by which it alleges it is altering its regulations. Doc. 20 at 17-18. However, Defendants do not explain exactly *how* the State's rulemaking process would be frustrated by the injunction. Rather, the Defendants abruptly shift to a mootness/ripeness argument, arguing that the State is in the process of implementing changes to its DD Waiver regulations that could potentially moot any deficiencies in the due process that has been afforded to DD Waiver recipients who were not given due process in the past. While that may be true, there is no suggestion by Defendants that any of these regulatory changes would be made to apply

retroactively to Plaintiffs, thereby granting them a second chance to go through the SIS process with the proper due process.

Third, Defendants argue that the hardships claimed by Plaintiffs B.W., A.C., and A.J. are "misdirected, premature, and speculative" because those Plaintiffs have failed to pursue their administrative remedies. Doc. 20 at 19. Defendants fault these Plaintiffs for not requesting a SIS Group H assignment, appealing the results of their fair hearings to state district court, or suing CMS (the federal agency that controls New Mexico's State Medicaid plan) for approving the State's waiver application that resulted in the adoption of the SIS. It is not clear from Defendants' brief how those factors create any hardship for Defendants, nor do those factors undermine the fact that the process the State has afforded the Plaintiffs in the administrative portion of the DD Waiver benefit determination process has not met due process standards. As explained above, the infringement of a constitutional due process right is a hardship in and of itself.

To be sure, there will be some cost and inconvenience to the Defendants when the preliminary injunction issues. There will be the cost of determining the benefits that Plaintiffs were receiving before the implementation of the SIS, and the cost of returning Plaintiffs to those benefit levels. [10] This likely will be inconvenient for employees of the DOH and HSD, as those agencies strive to return benefits to the status quo and adjust their procedures to meet due process

---

[10] The Court recognizes—and hopes the parties do as well—that some DD waiver recipients may be satisfied with their current levels of benefits and services and as a result may not wish to repeat the SIS assessment process. It would a waste of resources to force such individuals to undergo this complex procedure again if they do not wish to do so. In light of that fact, it would behoove the parties to reach an agreement as to how to identify such individuals and comply with their wishes. However, because this question is not squarely before the Court at this time, the Court does not address the specifics of it here.

standards. However, those costs are outweighed by the irreparable harm to the Plaintiffs, in both the deprivation of their constitutional rights and any mental and physical harm they may incur due to the deprivation of benefits without due process. Thus, this factor weighs heavily in favor of the injunction.

### 4.      Preliminary Injunction Not Adverse to the Public Interest

The Court concludes that the fourth and final factor weighs heavily in favor of the preliminary injunction.  As the Tenth Circuit has observed, "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012) (citations omitted). Here, the due process rights of DD Waiver recipients have been violated, and as a result it is in the public's best interest to halt those violations. In addition, there is a public interest in the continued provision of welfare benefits guaranteed by the Medicaid Act, which statute itself demonstrates the obvious public interest in the health and well-being of developmentally disabled citizens.

On the other hand, there is no harm to the public interest in entering the injunction. Despite the Defendants' claims, the injunction will not require the State to abandon the current CMS-approved DD Waiver in favor of the old assessment methodology employed under the State's expired waiver. There is simply no reason that the current DD Waiver cannot be carried out in a manner consistent with federal constitutional and statutory law.

For all the foregoing reasons, the Court concludes that Plaintiffs have met their burden to show that they are entitled to the preliminary injunctive relief they have requested. Accordingly, their motion will be granted.

**IT IS THEREFORE ORDERED** that:

(1)    Defendants' *Motion in Limine* [Doc. 59] is **DENIED;**

(2)    Defendants' *Motion for Partial Dismissal of Plaintiffs' Claims Due to Lack of Standing* [Doc. 58] is **DENIED**;

(3)    *Defendants' Expedited Motion to Strike Plaintiffs' Witnesses* **[Doc. 68]** is **DENIED WITHOUT PREJUDICE** as explained herein;

(4)    Plaintiffs' *Motion for Preliminary Injunction* [Doc. 11] is **GRANTED**; and

(5)    the Court will enter an Order of Preliminary Injunction contemporaneously with this Memorandum Opinion and Order.

_____

**UNITED STATES DISTRICT JUDGE**